**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

<table>
<tr><td>

UNITED STATES OF AMERICA, *et al.*,
*ex rel.* JAMES LANDOLT,

      Plaintiffs,

v.

MALLINCKRODT ARD LLC (f/k/a Mallinckrodt, ARD, Inc., f/k/a/ Questcor Pharmaceuticals, Inc.),

      Defendant.

</td><td>

)
)
)
)
)
)
)
)
)
)
)
)
)

</td><td>

Civil Action No. 18-cv-11931-PBS

</td></tr>
</table>

**THE UNITED STATES' OPPOSITION TO MALLINCKRODT'S MOTION TO DISMISS THE UNITED STATES' COMPLAINT IN INTERVENTION[1]**

---

[1] Plaintiff-Relator James Landolt is contemporaneously filing a separate opposition to Mallinckrodt's motion to dismiss the non-intervened state claims asserted in his First Amended Complaint.  That opposition incorporates and adopts the arguments herein.

## <u>TABLE OF CONTENTS</u>

STATUTORY BACKGROUND ................................................................................ 1

    I.       THE MEDICAID DRUG REBATE PROGRAM ................................................. 1

    II.     FDA APPROVAL OF NEW DRUG APPLICATIONS ....................................... 4

FACTUAL BACKGROUND ................................................................................ 5

PROCEDURAL BACKGROUND ...................................................................... 10

ARGUMENT ...................................................................................................... 13

    I.       THE COMPLAINT'S DETAILED ALLEGATIONS SATISFY EACH
           ELEMENT OF FALSE CLAIMS ACT SECTIONS 3729(a)(1)(G) and (D) ..... 13

        A.     The Complaint Adequately Alleges That Mallinckrodt Violated The
             "Reverse False Claims" Section Of The False Claims Act, Because
             Mallinckrodt Avoided An Obligation To Pay Money To The
             Government ............................................................................................. 13

             1.     The Complaint Alleges That Mallinckrodt Has An Obligation To
                  Pay Medicaid Rebates Based Upon The 1990 Base Date AMP .... 13

                  a.     The Rebate Statute's Requirement That Mallinckrodt Pay
                        Acthar  Rebates Creates An "Obligation" For False Claims
                        Act Purposes ................................................................... 13

                  b.     The Correct Base Date AMP For Acthar Is Its AMP From
                        The Third Quarter Of 1990. ............................................. 14

             2.     The Complaint Alleges That Mallinckrodt Has Avoided Or
                    Decreased Its Obligation to Pay The Correct Rebate Amount For
                    All Quarters Since 2013 .................................................................. 15

        B.     The Complaint Adequately Alleges A Violation of The False Claims Act's
             Conversion Provision, Because It Alleges That Mallinckrodt Possesses
             Money Or Property Belonging To The Government And Has Failed To
             Deliver It To The Government ................................................................ 16

    II.     THE COMPLAINT PLEADS FRAUD WITH PARTICULARITY ................... 18

        A.     The Complaint Alleges Sufficient Detail Concerning Mallinckrodt's
             Scheme To Underpay The Correct Rebate Amounts And To Keep The
             Government's Money. .......................................................................... 18

B.      Mallinckrodt Engaged in Fraud, Regardless Of Whether The Government Was Aware Of The Company's Misconduct. ...........................................19

III.     THE COMPLAINT ALLEGES THAT MALLINCKRODT ACTED WITH THE REQUISITE SCIENTER. ................................................................................... 19

A.      The Complaint Pleads Details Of Scienter That Exceed The Threshold For A Motion to Dismiss ................................................................................22

B.      Mallinckrodt Understood Its Statutory Rebate Obligations......................23

C.      Mallinkcrodt Repeatedly Ignored CMS's Warnings To Correct Acthar's Base Date AMP And To Pay The Proper Rebate Amount ........................24

D.      Mallinckrodt's Internal Actions Also Reflect Scienter.............................26

IV.     THE COMPLAINT PROPERLY PLEADS UNJUST ENRICHMENT.............. 28

CONCLUSION..................................................................................................................... 30

# TABLE OF AUTHORITIES

Cases

*Astra USA Inc. v. Santa Clara Cty.*,
   563 U.S. 110 (2011)......................................................................................... 2, 29-30

*Genzyme Corp. v. Fed. Ins. Co.*,
   622 F.3d 62 (1st Cir. 2010).......................................................................................29

*In re Lawson*,
   791 F.3d 214 (1st Cir. 2015).....................................................................................23

*Ipsen Biopharmaceuticals, Inc. v. Azar*,
   943 F.3d 953 (D.C. Cir. 2019) ........................................................................ 20-21, 26

*Kane ex rel. United States v. Healthfirst, Inc.*,
   120 F. Supp. 3d 370 (S.D.N.Y. 2015)........................................................................16

*Keystone Shipping Co. v. New England Power Co.*,
   109 F.3d 46 (1st Cir. 1997)......................................................................................15

*Lass v. Bank of Am., N.A.*,
   695 F.3d 129 (1st Cir. 2012) ...............................................................................29, 30

*Mallinckrodt ARD LLC v. Verma*,
   No. 1:19-cv-01471, 2020 WL 1312716 (D.D.C. Mar. 13, 2020) ...........................11, 15, 25, 26

*Mallinckrodt ARD LLC v. Verma*,
   No. 1:19-cv-01471, (D.D.C. May. 29, 2020)...........................................................12, 25

*Mallinckrodt ARD LLC v. Verma*,
   No. 20-5154 (D.C. Cir. Jun. 15, 2020) ......................................................................12

*Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*,
   552 F.3d 47 (1st Cir. 2009)......................................................................................28

*Mass. v. Mylan Labs.*,
   357 F. Supp. 2d 314 (D. Mass. 2005) .......................................................................30

*Olson v. Fairview Health Servs. of Minnesota*,
   831 F.3d 1063 (8th Cir. 2016) .................................................................................20

*United States ex rel. Ge v. Takeda Pharm. Co. Ltd.*,
   737 F.3d 116 (1st Cir. 2013).....................................................................................18

*United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*,
  842 F.3d 430 (6th Cir. 2016) ..............................................................................22, 23

*United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*,
  360 F.3d 220 (1st Cir. 2004)...............................................................................22, 26

*United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*,
  285 F. Supp. 3d 44 (D.D.C. 2017) .............................................................................17

*United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.*,
  No. CV 15-13065-PBS, 2018 WL 4539684 .......................................................12, 16

*United States ex rel. Wollman v. Gen. Hosp. Corp.*,
  394 F. Supp. 3d 174 (D. Mass. 2019) ................................................................22, 26

*United States v. Lahey Clinic Hosp., Inc.*,
  399 F.3d 1 (1st Cir. 2005)..........................................................................................29

<u>Statutes</u>

11 U.S.C. § 523....................................................................................................................23

21 U.S.C. § 355..................................................................................................................2, 4

31 U.S.C. § 3729.............................................................................................13, 17, 20, 22, 23

42 U.S.C. § 1396r-8 ................................................................................................... *passim*

<u>Regulations</u>

21 C.F.R. § 207.33 .................................................................................................................8

21 C.F.R. § 314.3 ...................................................................................................................5

21 C.F.R. § 314.70-71............................................................................................................5

<u>Federal Rules</u>

Fed. R. Civ. P. 8 ..................................................................................................................30

Fed. R. Civ. P. 9(b) .............................................................................................................22

Legislative History

Statement on Medicaid Anti-Discriminatory Drug Price and Patient Benefit Restoration Act, 136 Cong. Rec S12954 (Sept. 12, 1990)..............................................................................................3

H.R. Rep. No. 101-881 (1990), *reprinted in* 1990 U.S.C.C.A.N. 2017 .........................................1

Miscellaneous

77 Fed Reg. 5318, 5323 (Feb. 2, 2012) ......................................................................................29

Definition of Avoid, https://www.merriam-webster.com/dictionary/avoid ..................................15

FDA NDA Classification Manual, *available at* https://www.fda.gov/media/94381/download) ....5

Mallinckrodt plc, Press Release (June 15, 2020), *available at* http://mallinckrodt.com/investors/ ..................................................................................................12

Medicaid Drug Rebate Notice, Release No. 113 (Jun. 6, 2020)....................................................14

Medicaid Program, Announcement of Medicaid Drug Rebate Program National Rebate Agreement, 83 Fed. Reg. 12770 (Mar. 23, 2018)............................................................................2

Medicaid Program, Covered Outpatient Drugs, 81 Fed. Reg. 5170 (Feb. 1, 2016) .....................14

Medicaid Program, Drug Rebate Agreement, 56 Fed. Reg. 7049 (Feb. 21, 1991) ...2, 4, 13, 24, 30

Nat'l Drug Code Directory, U.S. Food & Drug Admin., https://www.fda.gov/drugs/drug-approvals-and-databases/national-drug-code-directory ...................................................................7

For years, defendant Mallinckrodt ARD LLC and its predecessor, Questcor

Pharmaceuticals, Inc. (collectively, "Mallinckrodt"), have reaped a financial windfall by

shortchanging the Medicaid program hundreds of millions of dollars in rebates under pretenses

that Mallinckrodt knew all along to be false.  In doing so, Mallinckrodt unlawfully shifted the

brunt of its over 70,000% price increase on Acthar to Medicaid.  Under the controlling statute,

Congress intended to insulate Medicaid from drug price increases like this one by requiring

companies that sell a drug to Medicaid to pay a rebate that includes the difference between the

drug's current price and the price the drug would have had if its price had gone up only at the

general rate of inflation.  To avoid that obligation after instituting steep price increases on Acthar

– a drug that Mallinckrodt and its predecessors have been producing, distributing, and marketing

since 1952 – Mallinckrodt began reporting that it first produced, distributed, and marketed

Acthar in 2013.  That reporting was false, and Mallinckrodt knowingly took advantage of that

fraud to underpay the rebates it owed to the Medicaid program.  For that reason, as further

discussed below, the Court should deny Mallinckrodt's motion to dismiss.

## STATUTORY BACKGROUND

## I.     THE MEDICAID DRUG REBATE PROGRAM

Medicaid is a jointly funded federal-state program providing healthcare benefits,

primarily to the poor and disabled.  Complaint in Intervention ("Compl.") ¶ 9.  In 1990, after

determining that Medicaid routinely paid more for "single source" (*i.e.*, "branded") prescription

drugs like Acthar, Congress enacted the Medicaid Drug Rebate Statute, 42 U.S.C. § 1396r-8,

which established the Medicaid Drug Rebate Program ("MDRP").  *See id.*; H.R. Rep. No. 101-

881, at 96 (1990), *reprinted in* 1990 U.S.C.C.A.N. 2017, 2108.  The Rebate Statute requires that,

in order for a manufacturer's drug to be eligible for Medicaid reimbursement, the manufacturer

must enter into a Rebate Agreement with the Secretary of Health and Human Services ("HHS"). 42 U.S.C. § 1396r-8(a)(1).

The Rebate Statute sets the terms of the Rebate Agreement, which has a standard template that is published in the Federal Register.  *See* Medicaid Program, Drug Rebate Agreement, 56 Fed. Reg. 7049, 7050 (Feb. 21, 1991) (original Rebate Agreement); Medicaid Program, Announcement of Medicaid Drug Rebate Program National Rebate Agreement, 83 Fed. Reg. 12770, 12784 (Mar. 23, 2018) (updated Rebate Agreement).  "The [Rebate Agreement] is not a contract," but instead is an "opt-in" mechanism that reflects manufacturers' acknowledgement that they are subjecting themselves to the obligations of the Rebate Statute in return for Medicaid coverage of their prescription drugs.  83 Fed. Reg. at 12771; *see also Astra USA Inc. v. Santa Clara Cty.*, 563 U.S. 110, 114, 118 (2011) (construing the Rebate Agreement as a "standardized agreement with HHS" which "serve[s] as the means by which drug manufacturers opt into the statutory scheme").  Mallinckrodt signed both the original and 2018 updated version of the Rebate Agreement.  Compl. ¶ 10.

The Rebate Statute and Agreement require Mallinckrodt to pay each state Medicaid program a per-unit quarterly rebate for each "dosage form and strength" of its "covered outpatient drug" that each Medicaid program has paid for during the quarter at issue.  42 U.S.C. § 1396r-8(c).[2]  The calculation of the quarterly rebate depends in part upon whether the "covered outpatient drug" at issue is classified as a "single source," "innovator multiple source," or "non-innovator multiple source" drug.  42 U.S.C. § 1396r-8(k)(7).  A "single source" drug is a

---

[2] The Rebate Statute defines "covered outpatient drug," in pertinent part, to mean "a drug . . . which is approved for safety and effectiveness as a prescription drug" under section 505 of the Food Drug and Cosmetic Act, 21 U.S.C. § 355(b).  42 U.S.C. § 1396r-8(k)(2).

"covered outpatient drug which is produced or distributed under an original new drug application." 42 U.S.C. § 1396r-8(k)(7)(A)(iv) (1991).[3]  Mallinckrodt does not dispute that Acthar is a "single source" drug.

For a "single source" drug, the Rebate Statute requires the manufacturer to pay each state Medicaid program a quarterly amount that includes an inflation-based "additional rebate" for each "dosage form and strength" of the drug.  42 U.S.C. § 1396r-8(c)(2).  If the drug was approved by the Food and Drug Administration ("FDA") prior to 1990, as Acthar was, this additional rebate equals the difference between the drug's current "average manufacturer price" ("AMP") and the AMP the drug would have had if the manufacturer had increased the drug's price only at the rate of inflation since the third quarter of 1990, when the MDRP began.  42 U.S.C. § 1396r-8(c)(2)(A)(ii).  For a "subsequently approved" drug (*i.e.*, a "covered outpatient drug approved by the Food and Drug Administration after October 1, 1990"), the additional rebate equals the difference between the drug's current AMP and the AMP the drug would have had if its manufacturer had increased its price only at the rate of inflation since "the drug was first marketed."  42 U.S.C. § 1396r-8(c)(2)(B).  The AMP that serves as the starting point for the "additional rebate" calculation is commonly called the "Base Date AMP."  Compl. ¶ 17.  As Congress intended, the additional rebate's inflation adjustment mechanism serves to insulate the Medicaid program from drug prices that increase faster than the rate of inflation, so long as drug manufacturers do not try to game the system.  *See* Statement on Medicaid Anti-Discriminatory Drug Price and Patient Benefit Restoration Act, 136 Cong. Rec S12954, S12956 (Sept. 12, 1990)

---

[3] Although not relevant to this case, in 2019, to "prevent the misclassification" of brand name drugs as generic (*i.e.* noninnovator multiple source) drugs for purposes off the MDRP, Congress deleted the word "original" from the definition of single source drug, *see* Pub. L. 116-16, 133 Stat 852, *852 (April 18, 2019), and enacted penalties for such misclassifications.  *Id.* at § 6.

(finding that "[s]tate [M]edicaid programs are under severe and increasing financial pressure as a result of drug price inflation").

By statute, a drug manufacturer like Mallinckrodt must pay each state Medicaid program this rebate within 30 days after the program reports to the manufacturer the total "units of each dosage form and strength and package size of each covered outpatient drug dispensed . . . for which payment was made." 42 U.S.C. §§ 1396r-8(b)(1), (2).  The state reporting must occur within 60 days of the end of each calendar quarter.  *Id.* § 1396r-8(b)(2).  To facilitate this process, the Centers for Medicare & Medicaid Services ("CMS"), a part of HHS, transmits to each state a quarterly "Unit Rebate Amount" ("URA") for each drug.  The URA shows the total per-unit rebate required for each "dosage form and strength" of a covered outpatient drug. Compl. ¶ 18.  CMS calculates each URA based upon the manufacturer's certified submissions to CMS, via the Drug Data Reporting ("DDR") system, which include quarterly pricing information and the Base Date AMP.  *Id.* ¶ 19.  CMS's calculation of the URA does not relieve a manufacturer of its independent statutory obligation to pay the proper rebate amount based upon the correct URA within 30 days of receiving utilization data from each state.  Rebate Agreement § II(b), 83 Fed. Reg. at 12785 ("CMS's URA calculation does not relieve the manufacturer of its responsibility to calculate the URA.").  Moreover, "[t]o the extent that changes in product, pricing, or related data cause increases to previously submitted total rebate amounts, the manufacturer will be responsible for timely payment of those increases in the same 30-day time frame."  *Id.* § II(f).

## II.    FDA APPROVAL OF NEW DRUG APPLICATIONS

FDA reviews applications from pharmaceutical manufacturers seeking approval to market drug products in the United States.  *See* 21 U.S.C. § 355.  A "new drug application"

("NDA") refers to a "stand alone" application under Section 505(b)(1) of the Federal Food, Drug, and Cosmetic Act and to section 505(b)(2) applications.  *See* 21 U.S.C. §§ 355(b)(1), (2). FDA assigns each NDA a unique six digit number.  Compl. ¶ 23.  After approval of an NDA, the manufacturer may file a "supplemental new drug application" ("sNDA") to make iterative changes to the drug, such as adding an indication or changing the labeling.  *See* 21 C.F.R. §§ 314.70-71.  An sNDA that seeks to add an indication to a preexisting drug is referred to as an "efficacy supplement" to the drug's approved NDA and becomes part of that NDA upon approval.  21 C.F.R. §§ 314.3(b).

Prior to July 27, 2009, when a new indication in a supplemental application needed to be reviewed by an FDA division other than the one responsible for the original NDA, the FDA created a "Type 6 NDA," with an associated NDA tracking number.  Compl. ¶ 25.  FDA's classification manual explains that the agency would assign a Type 6 NDA when a drug product "duplicates a drug product already approved or marketed in the United States by the same applicant, except that it is intended for a new indication or claim."  FDA NDA Classification Manual at 5, *available at* https://www.fda.gov/media/94381/download.  Under these circumstances, Type 6 NDA tracking numbers served the administrative purpose of tracking the supplemental application and routing its materials to the proper review division.  Compl. ¶ 25. Upon approval of such an efficacy supplement, the Type 6 NDA tracking number was closed and the now-approved indication became associated with the original NDA number.  *Id.*

## FACTUAL BACKGROUND

The FDA approved Acthar in 1952 pursuant to NDA 008372.  Compl. ¶ 33. Mallinckrodt did not invent or develop Acthar, but acquired rights to it in 2001 through its predecessor, Questcor.  Compl. ¶¶ 1, 34.  In 2001, Acthar cost approximately $50 per 5mL vial,

but, as the graph below shows, Questcor began to raise the price precipitously in 2007, and the

drug now costs nearly $40,000 per vial:



Compl., page 1.

In 2006, Questcor sought to add an indication for infantile spasms to Acthar's label and

accordingly filed an efficacy supplement to the Acthar NDA.  Compl. ¶ 34.  In 2008, FDA

notified Questcor that it had "created a separate NDA number for your infantile spasm

submission *for administrative purposes*," and that "[t]he new number is NDA 22-432."  Compl.

Ex. 6 (emphasis added).  When FDA approved Questcor's application in 2010, the agency

directed Questcor to address all future submissions to "the original **NDA 008372** for this drug

product, not to this NDA [022432]," with an exception for the final printed labeling requested by

FDA.  Compl. Ex. 11 at 5 (emphasis in original).  In a subsequent public statement, Questcor

correctly described the 2010 approval as the approval of a "supplemental new drug application."

*See* Compl. ¶ 41.  Similarly, in subsequent correspondence with FDA, Questcor referred to the

2010 NDA number as the "tracking NDA."  Compl. ¶ 41 & Exs. 12-13.  Since acquiring

Questcor, Mallinckrodt also has referred to the 2010 approval as a "supplemental NDA," Compl.

¶ 43, and, except for purposes of calculating Acthar's Medicaid rebates, has treated NDA 008372

as the NDA under which it produces, distributes, and markets the drug.  *Id.* ¶¶ 45-46.

Through the end of 2012, Questcor correctly paid Medicaid rebates on Acthar using a Base Date AMP from the third quarter of 1990.  Compl. ¶ 47.  By that time, because the company had been increasing Acthar's price far faster than the rate of inflation, the company's quarterly Medicaid rebate obligations for Acthar had become substantial.  *Id.*

The company wanted a way to reduce its Medicaid rebates without lowering the drug's price.  Compl. ¶ 48.  Applying a later Base Date AMP for Acthar would achieve that goal.  *Id.*  In a March 2012 meeting with CMS and in a May 2012 letter to the agency, Questcor threatened to quit the MDRP if it could not apply a later Base Date AMP for Acthar.  *Id.* ¶¶ 49-50.  In its letter, Questcor argued that it could apply a later Base Date AMP for Acthar under either of two rationales.  *Id.* ¶ 50 and Ex. 18.  Questcor's letter also stated that "[o]n October 15, 2010, Acthar was approved to treat infantile spasms under NDA 22-432," Compl. Ex. 18 at 4, without disclosing to CMS that NDA 22-432 was a mere tracking device that FDA had assigned to the efficacy supplement for Acthar's pre-existing NDA from 1952.  Compl. ¶¶ 50, 52.  Nor did the letter disclose that FDA had informed Questcor that the 2010 NDA tracking number would "no longer be used" upon approval of the efficacy supplement.  *Id.* ¶ 52.  Questcor itself had little hope that its petition to CMS would succeed; shortly after submitting the letter, the company's CEO wrote that "our probability is still low here, but non-zero."  Compl. Ex. 19.

In an August 2012 response, CMS did not adopt either of Questcor's rationales but instead found that "Acthar Gel is eligible for a new base date AMP" based on the agency's incorrect understanding that "the recently approved Acthar Gel was approved under a different [NDA] from the original product."  Compl. ¶ 53 & Ex. 20.  In the letter, CMS further expressed

its view that "the assignment of a new NDC-9[4] to the recently approved Acthar Gel would be necessary," and cautioned that "CMS does not have the current ability to allow a manufacturer to replace the original reported base date AMP with a new base date AMP midway through the life of a product." *Id.* The letter also advised that it was "limited to and based on the facts and information presented to us and has no applicability to a different set of facts. . . . This letter is not a release of liability." *Id.*

Questcor, and its successor, Mallinckrodt, knew that there was no "recently approved Acthar Gel." They knew that FDA had "recently approved" only a new *indication* for the existing Acthar Gel, not a new Acthar Gel. *See* Compl. ¶¶ 41-43, 45. Nonetheless, they did nothing to correct the agency's misunderstanding, but instead took full advantage of it. In January 2013, Questcor reported a new NDC for Acthar in CMS's DDR system and thereafter began paying rebates on the drug as if it had been first produced, distributed, and marketed in the first quarter of 2013, despite knowing that the drug had not changed since 1952. *Id.* ¶¶ 45, 54, 56. Mallinckrodt continued that practice until this year.

Resetting Acthar's Base Date AMP enabled Questcor and Mallinckrodt to avoid paying state Medicaid programs hundreds of millions of dollars in the ensuing years. Compl. ¶ 55, 68, 75. Soon after the company understood the extent of the financial windfall it would receive as a

---

[4] FDA's National Drug Code Directory website explains that "[d]rug products are identified and reported using a unique, three-segment number, called the National Drug Code (NDC), which serves as a universal product identifier for drugs. FDA publishes the listed NDC numbers and the information submitted as part of the listing information in the NDC Directory[,] which is updated daily." Nat'l Drug Code Directory, U.S. Food & Drug Admin., https://www.fda.gov/ drugs/drug-approvals-and-databases/national-drug-code-directory. An NDC consists of digits that identify the labeler, product, and package size and type. *See* 21 C.F.R. § 207.33(a). FDA assigns the labeler code. 21 C.F.R. § 207.33(b)(1)(i). The drug manufacturer proposes the product and packaging codes. 21 C.F.R. § 207.33(d).

result of CMS's misunderstanding, Questcor's Chief Commercial Officer commented that it was a "stunning" result for the company.  Compl. ¶ 55 & Ex. 22.

By 2016, however, CMS realized that the Acthar then on the market was no different than the Acthar that had been on the market since 1952.  Accordingly, on April 13, 2016, CMS sent Mallinckrodt a letter conveying the agency's (now correct) understanding that "Acthar Gel is marketed under NDA 008732 not NDA 022432."  Compl. Ex. 23.  CMS thus requested that Mallinckrodt "make the necessary correction to ensure accurate information is reported to the MDR[P]."  *Id.*  After receiving this letter, Mallinckrodt quickly calculated that making "the necessary correction" to Acthar's Base Date AMP would result in a 223 percent increase in the company's quarterly rebate payments for Acthar.  Compl. ¶ 59.  By June 2016, the company had calculated that correcting Acthar's Base Date AMP also would cost $258 million in back rebates. *Id.* ¶ 68.

Mallinckrodt decided to avoid incurring that cost, even though it knew CMS was right. Shortly after receiving CMS's April 13, 2016 letter, several Mallinckrodt finance and regulatory employees exchanged e-mails about the agency's rationale.  They concurred that Acthar's 2010 Type 6 NDA number, 022432, "will eventually go away," and that the Acthar NDC Questcor had used prior to 2013 "will be the final NDC and the FDA Approval date will be 04/29/1952." Compl. ¶ 60 & Ex. 25.  One of the participants in this e-mail chain later testified that "Regulatory agreed with CMS basically."  Compl. ¶ 61.  Notwithstanding the concurrence with CMS, Mallinckrodt tried to stall for time.

Over the next four years, Mallinckrodt repeatedly rebuffed the agency's demands that the company change Acthar's Base Date AMP, and Mallinckrodt continued to pay Medicaid rebates as if it had first manufactured, distributed, and marketed Acthar in 2013, even though it knew

that was not the case.  *See* Compl. ¶¶ 63-88.[5]  During those years, Mallinckrodt contended that

FDA had approved Acthar itself – not just an additional indication for Acthar – in 2010, rather

than in 1952.  Thus, for example, in an e-mail to CMS on July 6, 2016, Mallinckrodt asserted

that NDA 022432 [the 2010 Type-6 NDA] was "the correct FDA assigned application number

for *the approval of the product* that was discussed in the CMS letter of August 6, 2012."  Compl.

Ex. 26 (emphasis added).

Ultimately, in May 2019, Mallinckrodt filed an Administrative Procedure Act ("APA")

complaint action against CMS in the United States District Court for the District of Columbia.

*See* Complaint, *Mallinckrodt ARD LLC v. Verma*, No. 1:19-cv-01471 (D.D.C.) (attached hereto

as Attachment A).  In that complaint, Mallinckrodt reiterated an unfounded theme from its prior

correspondence with CMS and asserted that "[t]here are two Acthars discussed in this complaint:

One approved in 2010, and one in 1952." *Id.* at 2 n.1.  Mallinckrodt knew all along that this was

a canard, because FDA had approved Acthar only once, in 1952, and had merely approved a new

indication for Acthar in 2010.  Nevertheless, the company continued to make this assertion as

part of its effort to continue to avoid paying the rebates it knew it owed for Acthar.

### PROCEDURAL BACKGROUND

On September 20, 2018, relator James Landolt initiated this *qui tam* action alleging that

Mallinckrodt knowingly underpaid Medicaid rebates on Acthar by using a false Base Date AMP

for the drug.  *See* Dkt. No. 1.  On January 18, 2019, the Department of Justice sent Mallinckrodt

a Civil Investigative Demand for documents concerning Acthar's Base Date AMP.  On March 3,

2020, the United States filed its Complaint in Intervention.  (Dkt. No. 24).

---

[5] In the meantime, a 2018 Mallinckrodt internal presentation recognized that CMS had "retracted" its 2012 letter, and that the resulting rebate liability "would be retroactive to 2010 through current, and would be in the hundreds of millions of dollars."  Compl. ¶ 77 & Ex. 29.

As noted above, during the course of the government's investigation, Mallinckrodt initiated an APA action against CMS in the United States District Court for the District of Columbia.  The parties to that action filed cross-motions for summary judgment and, on March 13, 2020, the court granted the government's motion and denied Mallinckrodt's motion.  *See Mallinckrodt ARD LLC v. Verma*, 2020 WL 1312716 (D.D.C. Mar. 13, 2020).[6]  In its order, the court noted that, in 2007, Questcor had "raised Acthar's price from $1,650 to $23,269 per vial" and subsequently "grew antsy . . . about what it perceived to be the drug's curtailed profitability under the Medicaid Drug Rebate Program, as demonstrated by a letter Questcor's General Counsel sent to CMS on May 8, 2012."  *Id.* at *7.  The court further observed that Questcor's May 2012 letter "did not make clear that, with the exception of Questcor's submission of final carton and container labels, NDA number 002432 became obsolete upon approval."  *Id.* at *9.

Ultimately, the court found that Mallinckrodt's position "fails to account for the fact that the FDA's 2010 letter approving NDA number 022432 makes clear that the FDA viewed Acthar with the infantile spasm indication to be the same 'drug product' that was originally approved in 1952 under NDA 008372."  *Id.* at *17.  As the court explained, the "statute's straightforward textual language dictat[es] that a drug's base date AMP is tied to the date when the FDA approved the drug and the drug was first marketed."  *Id.*  That date was 1952.  *Id.*  The court also noted that Mallinckrodt must have perceived the error in CMS's reasoning in 2012, because the Acthar involved in the 2010 NDA was not a new product, and thus "it would have behooved

---

[6] Earlier on March 13, 2020, Mallinckrodt filed an assented-to motion to extend the time to respond to the United States' Complaint in Intervention in this case.  In the motion, Mallinckrodt stated that "the proposed extension would serve the interests of judicial economy and efficient case management, as there is a lawsuit in the US District Court for the District of Columbia pending summary judgment decision, which Mallinckrodt asserts *involves the same underlying facts and issues*."  Dkt. No. 31 at 1, 2 (emphasis added).

[Mallinckrodt] to clarify the agency's understanding, if only to insulate [the company] from a dispute down the road." *Id.* at *18. "Placed on notice of that erroneous assumption via CMS's 2012 approval letter, Questcor (and later Mallinckrodt) gambled by implementing a new base date AMP for Acthar without first clarifying this point. . . ." *Id.* at *19.

On May 29, 2020, after Mallinckrodt moved for reconsideration and a stay pending appeal, the district court for the District of Columbia denied that motion, too. *See* Attachment B. The decision noted that "Mallinckrodt's entire case is premised on convincing the Court that Acthar with the infantile spasm indication qualifies as a 'distinct' single source drug from the version of Acthar that the FDA approved in 1952 under NDA number 008372." Att. B at 14. The court characterized this position as a "charade," *id.* at 4 n.2, and concluded that "Mallinckrodt has reaped a true windfall to the det[ri]ment of both the nation's poor and its taxpayers by adhering to this legally untenable position." *Id.* at 17. The reconsideration decision also reiterated the court's view that "Questcor was on obvious notice" in 2012 that CMS incorrectly understood Acthar after 2010 to be a "different 'drug product' from the 'original product,' based on the fact that Questcor had reported that the drug was approved under a different NDA." *Id.* at 22 n.10. The court observed that CMS had "correctly cautioned Mallinckrodt in 2012" that "[t]he statute plainly does not contemplate that a covered outpatient drug's base date AMP can be 'reset' later during the drug's lifecycle." *Id.* at 4.

On June 15, 2020, the Court of Appeals for the District of Columbia Circuit likewise denied Mallinckrodt's motion for a stay pending appeal. *Mallinckrodt ARD LLC v. Verma*, No. 20-5154 (D.C. Cir. Jun. 15, 2020). Upon receipt of this ruling, the company announced that it would "change the base date AMP for Acthar Gel, as directed by CMS." Mallinckrodt plc, Press Release (June 15, 2020), *available at* http://mallinckrodt.com/investors/.

**ARGUMENT**

I.   **THE COMPLAINT'S DETAILED ALLEGATIONS SATISFY EACH ELEMENT OF FALSE CLAIMS ACT SECTIONS 3729(a)(1)(G) and (D).**

   A.   **The Complaint Adequately Alleges That Mallinckrodt Violated The "Reverse False Claims" Section Of The False Claims Act, Because Mallinckrodt Avoided An Obligation To Pay Money To The Government.**

      1.   The Complaint Alleges That Mallinckrodt Has An Obligation To Pay Medicaid Rebates Based Upon The 1990 Base Date AMP.

         a.   The Rebate Statute's Requirement That Mallinckrodt Pay Acthar Rebates Creates An "Obligation" For False Claims Act Purposes.

The Medicaid rebates that Mallinckrodt owes constitute "obligations" for purposes of the 31 U.S.C. § 3729(a)(1)(G). The False Claims Act defines an "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). Medicaid rebates fall squarely within this definition. The Rebate Statute requires each manufacturer that participates in the MDRP to pay the correct rebate amount to each state Medicaid program "not later than 30 days after the date of receipt of . . . information on the total number of units of each dosage form and strength and package size of each covered outpatient drug dispensed . . . for which payment was made" by the state Medicaid program during the quarter at issue. 42 U.S.C. § 1396r-8(b)(1)(A), (2)(A). The state reporting that triggers this payment obligation must take place "not later than 60 days after the end of each rebate period." *Id.* § 1396r-8(b)(2)(A). In other words, federal law requires that a participating manufacturer pay the correct rebate amount to each state within 90 days of the end of each calendar quarter. *Id.*; *see also* Rebate Agreement § II(b). Mallinckrodt's duty to pay quarterly Medicaid rebates was therefore "established" by statute – it was not "contingent," or dependent on some "discretionary" act, *cf.* Memorandum in Support of

13

Motion to Dismiss (Dkt. 85) ("Memo") at 23 – and qualifies as an "obligation" for purposes of the False Claims Act.

> b.      The Correct Base Date AMP For Acthar Is Its AMP From The Third Quarter Of 1990.

To satisfy its obligation to pay quarterly rebates, Mallinckrodt had a further obligation to use the correct Base Date AMP, the drug's AMP from the third quarter of 1990.  Contrary to Mallinckrodt's suggestion, the determination of the correct Base Date AMP also was a product of applying the statute to the fact of Acthar's FDA approval date; it was never a product of agency "discretion[]."  *Cf.* Memo at 23.[7]  Acthar is a single source drug that, in the language of the Rebate Statute's definition of that term, has always been "produced or distributed under an original new drug application" that FDA approved in 1952.  Compl. ¶¶ 33, 45-46; 42 U.S.C. § 1396r-8(k)(7)(A)(iv) (1991).  The statute thus dictates that Acthar's Base Date AMP be its AMP from "the calendar quarter beginning July 1, 1990."  42 U.S.C. § 1396r-8(c)(2)(A)(ii)(II).  Acthar could have a later Base Date AMP only if FDA had approved it "after October 1, 1990" and it was "first marketed" thereafter, *see* 42 U.S.C. § 1396r-8(c)(2)(B), but that is not the case.  There is no Acthar that was approved or first marketed after 1990.  *Cf.* Compl. ¶ 39 (noting that FDA merely approved a new *indication* for Acthar in 2010).  As the *Verma* court held, "[b]ecause Acthar was first marketed well before October 1, 1990, its base date AMP under the

---

[7] Without pointing to any allegation or document, Mallinckrodt baldly asserts that CMS "determined that Mallinckrodt had misclassified a covered outpatient drug."  Memo at 23.  CMS did no such thing.  There is no dispute that, since the advent of the MDRP, Acthar has always been "classified" as a single source drug.  *See id.* at 14 ("CMS's own regulations require Acthar to be treated as [a] 'single source drug[.]'"); *see also* Medicaid Drug Rebate Notice, Release No. 113 (Jun. 6, 2020) (recognizing that classification refers to the drug being a single source, innovator multiple source, or noninnovator multiple source drug); Medicaid Program; Covered Outpatient Drugs, 81 Fed. Reg. 5170, 5191 (Feb. 1, 2016) (same).  CMS never made a new determination of Acthar's classification that somehow triggered Mallinckrodt's obligation to pay rebates based on Acthar's 1990 Base Date AMP.

statute is 'the average manufacturer price for . . . the calendar quarter beginning July 1, 1990,'" adjusted for inflation.  2020 WL 1312716, at *19 (quoting 42 U.S.C. § 1396r-8(c)(2)(A)(ii)(II)).

Notably, Mallinckrodt appears now to have abandoned its "two Acthars" argument, and does not seriously contest that the correct Base Date AMP for (the one and only) Acthar is the AMP the drug had in the third quarter of 1990.[8]  Although Mallinckrodt argues in a footnote that the *Verma* court's reasoning was "flawed," Memo at 22 n.13, collateral estoppel bars any other interpretation of the Rebate Statute.  "The principle of collateral estoppel, or issue preclusion, . . . bars relitigation of any factual or legal issue that was actually decided in previous litigation between the parties, whether on the same or a different claim."  *Keystone Shipping Co. v. New England Power Co.*, 109 F.3d 46, 51 (1st Cir. 1997) (internal quotation marks and citations omitted).  Regardless, because Acthar was approved in 1952, the statute makes clear that Mallinckrodt had an obligation to report Acthar's Base Date AMP as the AMP the drug had in 1990, and to pay rebates to the state Medicaid programs accordingly.

      2.     The Complaint Alleges That Mallinckrodt Has Avoided Or Decreased Its Obligation To Pay The Correct Rebate Amount For All Quarters Since 2013.

Mallinckrodt has avoided its obligation to pay the correct rebate amount for each quarter from 2013 to 2020.  Although the False Claims Act does not define "avoid," the plain meaning of avoidance includes "refrain[ing] from."  *See* Definition of Avoid, *Merriam Webster Dictionary*, *available at* https://www.merriam-webster.com/dictionary/avoid.  Other courts have adopted this "plain meaning," concluding that the term "includes behavior where an individual is put on notice of a potential issue, is legally obligated to address it, and does nothing."  *Kane ex*

---

[8] Not only was the "two Acthars" argument devoid of any factual or legal basis, there is no evidence that anyone at Mallinckrodt ever believed it.  The company's employees knew that Mallinckrodt always had produced, distributed, and marketed only one Acthar.  Compl. ¶ 60.

*rel. United States v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 394 (S.D.N.Y. 2015), *cited with approval in United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.*, No. CV 15-13065-PBS, 2018 WL 4539684, at *6 (D. Mass. Sept. 21, 2018).  Mallinckrodt's inaction falls within the heartland of the conduct that the *Kane* court envisioned.  Beginning in April 2016, CMS initiated what became several years of explicit warnings to Mallinckrodt that it was paying Medicaid rebates using an incorrect Base Date AMP.  Compl. ¶ 57.  Despite being on notice of its obligation to correct the Base Date AMP and pay the government its unpaid rebate liability – which Mallinckrodt had gone so far as to calculate, *id.* ¶ 68 – Mallinckrodt repeatedly "refrained from" doing so.  *See id.* ¶¶ 69-70, 72, 74, 75, 79.  Mallinckrodt thus avoided paying its outstanding rebate liability.

That CMS's 2016 and 2017 correspondence did not provide Mallinckrodt with a specific deadline to correct its Base Date AMP does not compel a different conclusion.  As discussed above, the Rebate Statute requires that a manufacturer pay Medicaid rebates within 30 days of each state reporting to the manufacturer the state's utilization data from the prior quarter.  42 U.S.C. § 1396r-8(b)(1), (2).  Mallinckrodt's statutory obligation to pay accurate rebates on its Acthar sales for each quarter since 2013 accrued independently of, and long before, CMS instructed the company to comply with it.  Nonetheless, instead of correcting Acthar's Base Date AMP, Mallinckrodt refrained from complying with the agency's directive, and refrained from paying the correct rebate amounts.

### B.     The Complaint Adequately Alleges A Violation of The False Claims Act's Conversion Provision, Because It Alleges That Mallinckrodt Possesses Money Or Property Belonging To The Government And Has Failed To Deliver It To The Government.

The government has sufficiently pled its conversion claim against Mallinckrodt.  The False Claims Act conversion provision imposes liability on one who "has possession, custody, or

control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property."  31 U.S.C. § 3729(a)(1)(D). Here, the government alleges that Mallinckrodt paid some, but not all, of its rebate obligation to the government.  *See* Compl. ¶¶ 8, 69, 72, 75, 78, 92, 101-104.  This was money that Mallinckrodt was legally obligated to pay to the government.  *See* Compl. ¶¶ 9-21 (describing MDRP).  Accordingly, the complaint adequately alleges that Mallinckrodt violated the False Claims Act's conversion provision.

For the same reasons as discussed with respect to the government's reverse false claims claim, Mallinckrodt's obligation to deliver money to the government pursuant to the Rebate Statute was not contingent.  The Rebate Statute lays out a framework for the timing of participating manufacturers' payments to the Medicaid programs, stating that manufacturers must make payments within 90 days of the end of each calendar quarter, and within 30 days after receiving invoices from the states.  *See* 42 U.S.C. § 1396r-8(b).  Mallinckrodt relies on *United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 285 F. Supp. 3d 44, 55 (D.D.C. 2017) for the proposition that the money "'to be used[ ] by the Government' cannot be contingent."  *Id.* In that case, the relator asserted that the defendant had improperly retained money for penalties that the government had not yet assessed.  *Id.* at 55-56.  Here, however, Mallinckrodt's obligation to pay rebates did not require government action in order to become due.

That Mallinckrodt retains possession of the government's money – and has not yet delivered it to the government – strengthens the government's case rather than weakens it.  *Cf.* Memo at 25-26 (arguing that Mallinckrodt cannot convert money that was not in the government's possession).  The conversion provision, by its terms, extends to money that contractors have not yet delivered to the government.  *See* 31 U.S.C. § 3729(a)(1)(D) (imposing

liability on entities that "ha[ve] possession, custody, or control of property or money . . . to be used[] by the government").  Here, the government alleges that Mallinckrodt retained possession of revenue it derived from Medicaid reimbursements, and that Mallinckrodt should have delivered this money to the government for the government's use.  Compl. ¶¶ 101-104.  Accordingly, Mallinckrodt cannot find a defense to the government's conversion claim from its failure to deliver the government's money.

## II.  THE COMPLAINT PLEADS FRAUD WITH PARTICULARITY.

### A.  The Complaint Alleges Sufficient Detail Concerning Mallinckrodt's Scheme To Underpay The Correct Rebate Amounts And To Keep The Government's Money.

The government's complaint contains great detail concerning Mallinckrodt's scheme to withhold the correct rebate amounts from the government, satisfying Rule 9(b).  The rule requires that the plaintiff "specify the who, what, where, when, and how of the alleged fraud." *United States ex rel. Ge v. Takeda Pharm. Co. Ltd.*, 737 F.3d 116, 123 (1st Cir. 2013) (citations and internal quotation marks omitted).  The government has pleaded each of these elements:

- The government has pleaded the "who," identifying not only the perpetrator of the alleged fraud – Mallinckrodt – but also identifying the individuals who either corresponded with CMS or participated in internal discussions concerning that correspondence.  *See, e.g.*, Compl. ¶ 59, 67.

- The government has pleaded the "what" and "when," identifying the specific obligations – quarterly rebates – that Mallinckrodt has failed to pay.  Compl. ¶ 90 (alleging that Mallinckrodt has underpaid its rebate liability for every quarter since January 1, 2013).  In addition, the government has described a detailed timeline of

how Questcor knowingly took advantage of CMS's misunderstanding in 2012 and then, after 2016, how Mallinckrodt knowingly defied the agency.

- The "where" was always at Mallinckrodt's and Questcor's offices. *See, e.g.*, Compl. ¶ 67 & Ex. 27 (referencing a meeting at Mallinckrodt's offices discussing response to CMS correspondence).

- Finally, and perhaps most importantly, the complaint sets forth in granular detail "how" Mallinckrodt illegally withheld money from CMS, beginning first in 2012, when Mallinckrodt failed to disclose important facts to CMS and did nothing when CMS relied on a false factual premise to reach a conclusion that benefited the company, *see* Compl. ¶¶ 52-54, and then again from 2016 to 2019, when Mallinckrodt held CMS at an arm's length, always seeking to prolong its attempted "ongoing dialogue," *see* Memo at 21, in the apparent hope that CMS would abandon its efforts to reclaim the money that Mallinckrodt owed. Compl. ¶¶ 60-88. The complaint further details how Mallinckrodt ignored the views of its own regulatory and government pricing team, which understood CMS's directive, understood that Mallinckrodt was openly defying that directive, and understood that the correct Base Date AMP for Acthar was the AMP from the third quarter of 1990. Compl. ¶¶ 60-62.

In sum, the complaint satisfies Rule 9(b) because it contains significant and sufficient specificity about the conduct that gives rise to the government's claims.

### B.     Mallinckrodt Engaged In Fraud, Regardless of Whether the Government Became Aware Of The Company's Misconduct.

The Court should reject the proposition that Mallinckrodt's open defiance of CMS somehow prevents the government from asserting claims under the False Claims Act. The statute makes Mallinckrodt's conduct unlawful regardless of whether the government became

19

aware of it (and, in this case, repeatedly protested it).  Furthermore, even though deception is not

a required element of the False Claims Act claims at issue, Mallinckrodt's conduct was

deceptive.

Concealment is not an element of either of the government's claims under the False

Claims Act.  Count I alleges reverse false claims, specifically that Mallinckrodt has knowingly

and improperly avoided or decreased its obligation to pay money to the government, in violation

of 31 U.S.C. § 3729(a)(1)(G).  Compl. ¶¶ 94-99.  Count II alleges conversion, specifically that

Mallinckrodt has retained possession of government funds, which Mallinckrodt has failed to

deliver to the government in violation of 31 U.S.C. § 3729(a)(1)(D).  Compl. ¶¶ 101-104.

Mallinckrodt's open defiance of CMS's repeated demands that Mallinckrodt correct Acthar's

Base AMP does not negate liability under either of these provisions.  The complaint pleads each

of the elements of these provisions, and the government therefore has satisfied its pleading

burden under Rule 9(b).[9]

Mallinckrodt's open defiance of CMS makes the government's fraud case stronger – not

weaker.  For purposes of the False Claims Act, "[e]ven if a regulated party" such as

Mallinckrodt, "adopts a 'reasonable' interpretation of an 'ambiguous' statute," which

Mallinckrodt does not argue and the government does not concede, "it can nonetheless be

deemed liable for knowingly making a false statement if it had been warned away from that

interpretation by authoritative agency guidance."  *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943

---

[9] In arguing that it cannot have reverse false claims liability, Mallinckrodt cites *Olson v. Fairview Health Servs. of Minnesota*, 831 F.3d 1063 (8th Cir. 2016), but that case stands only for the proposition that liability under § 3729(a)(1)(G) cannot attach until the obligation at issue has been established.  *See id.* at 1074.  As discussed above, the Rebate Statute established that Mallinckrodt must pay the correct rebate amounts within 30 days of receiving states' invoices.

F.3d 953, 957–58 (D.C. Cir. 2019) (quotation omitted).  Thus, correspondence from CMS that advised Mallinckrodt of its obligations under the Rebate Statute "could be potentially dispositive proof in an enforcement action" that Mallinckrodt acted knowingly.  *Id.* at 958.  Consider the alternative:  if government contractors openly violate the terms of their statutory, regulatory, or contractual obligations, while at the same time shouting at the top of their lungs that they are innocent of any wrongdoing, such protestations would insulate them from liability under the False Claims Act.  This is not – and cannot be – the law.  Mallinckrodt's theft of money from the public fisc violates the False Claims Act, *especially* because it was open and notorious.

Regardless of whether an open dispute concerning the meaning of the Rebate Statute can give rise to liability under the False Claims Act, Mallinckrodt's conduct was not in good faith.  As discussed above, Questcor failed to correct CMS's misimpression (for which Questcor was responsible) that there was a "recently approved Acthar Gel . . .  approved under a different [NDA] from the original product."  Compl. ¶ 53.  And, beginning in 2016, Mallinckrodt refused to correct Acthar's Base Date AMP despite knowing full well that it had an obligation to adjust Acthar's Base AMP and that its protestations to the contrary were spurious.  *Compare id.* ¶ 65 (alleging that, as early as June 2016, Mallinckrodt personnel understood that CMS had withdrawn any approval it had granted Questcor to reset Acthar's Base Date AMP) *and id.* ¶ 77 (citing PowerPoint presentation acknowledging that CMS "retracted its [2012] approval" and stated Acthar had to revert to the 1990 Base Date AMP) *with id.* ¶¶ 69, 73 (correspondence from Mallinckrodt in which it continued to defy CMS's directive that Mallinckrodt needed to adjust Acthar's Base AMP).  Mallinckrodt knew what CMS had directed it to do, knew the agency was right, and still willfully ignored the agency's instructions.  Such behavior does not reflect an

"ongoing dialogue," but rather shows a recalcitrant government contractor that refuses to play by the rules.

## III.     THE COMPLAINT ALLEGES THAT MALLINCKRODT ACTED WITH THE REQUISITE SCIENTER.

### A.     The Complaint Pleads Details Of Scienter That Exceed The Threshold For A Motion to Dismiss.

Alleging that Mallinckrodt refused CMS's directives for years either to correct its Base Date AMP reporting or to pay the rebates it owed, the complaint pleads sufficient facts showing that Mallinckrodt acted "knowingly" for purposes of the government's reverse false claims and conversion counts.  Under the False Claims Act, "knowledge" means "actual knowledge," "deliberate ignorance," or "reckless disregard," and does not require proof of specific intent to defraud.  31 U.S.C. § 3729(b)(1).  Knowledge may be alleged generally.  FED. R. CIV. P. 9(b); *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 228 (1st Cir. 2004); *United States ex rel. Wollman v. Gen. Hosp. Corp.*, 394 F. Supp. 3d 174, 190 (D. Mass. 2019). Under the reverse false claims provision, 31 U.S.C. § 3729(a)(1)(G), "knowingly" refers to a defendant's "awareness of *both* an obligation to United States *and* [its] violation of that obligation."  *United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 436 (6th Cir. 2016) (emphasis in original).  The complaint "must allege facts that create the inference" that Mallinckrodt knew it was required to pay rebates due based on the 1990 Base Date AMP, "or that it 'acted in deliberate ignorance' or in 'reckless disregard' of this fact," and knew that it failed to do so.  *Id.* at 437.

Similarly, under the False Claims Act conversion claim, 31 U.S.C. § 3729(a)(1)(D), the "knowingly" requirement applies to both "deliver, or cause to be delivered," and to "less than all of that money or property," meaning the defendant "knows" that it has delivered or caused to be

delivered less than all the money or property belonging to (*i.e.*, "used, or to be used, by") the government.  31 U.S.C. § 3729(a)(1)(D); *Harper*, 842 F.3d at 439.  Thus, under both counts, the complaint must allege facts that create an inference that Mallinckrodt "knowingly" paid less than the full Medicaid rebates that it knew, deliberately ignored, or recklessly disregarded were due for Acthar, *i.e.*, the rebates due based on the 1990 Base Date AMP.

In an apparent attempt to obtain from this Court a holding that Mallinckrodt did not engage in intentional fraud that would be non-dischargeable in a potential bankruptcy proceeding, Mallinckrodt focuses much of its brief not on the False Claims Act scienter standard, but instead on the bankruptcy standard for dischargeability of a fraud claim.  *See* Memo at 16.[10]

Under either standard, the complaint adequately pleads that Mallinckrodt intentionally defrauded CMS and the states because Mallinckrodt always knew that Acthar was the same drug that the FDA approved in 1952, and thus that there was no statutory basis to assign a new Base Date AMP to the drug.  Specifically, the complaint pleads that Mallinckrodt:  (1) knew of its statutory obligations to pay the correct Medicaid rebates, (2) knowingly underpaid Medicaid rebates since 2013 and received repeated warnings from CMS beginning in 2016 that its calculations and rebate payments were incorrect because they were not based on NDA 008372, (3) internally acknowledged that CMS was right, and (4) calculated the extent to which the company was underpaying its Medicaid rebates.

---

[10] Mallinckrodt cites a bankruptcy case, *In re Lawson*, 791 F.3d 214 (1st Cir. 2015), but that case does not define the outer contours of fraud or "actual fraud."  Rather, it holds only "that 'actual fraud' under § 523(a)(2)(A) [of the Bankruptcy Code] is not limited to fraud effected by misrepresentation." *Id.* at 220.

### B.     Mallinckrodt Understood Its Statutory Rebate Obligations.

As a participant in the Medicaid Drug Rebate Program, Mallinckrodt knew of and

explicitly agreed to pay the statutorily-required rebates each quarter, as well as any retroactive

rebate payments associated with any change in pricing.  Mallinckrodt signed Rebate Agreements

in 1991, 2007, and 2018.  Compl. ¶ 10.  Both the Rebate Statute and Rebate Agreement require a

manufacturer to pay each state Medicaid program a per-unit quarterly rebate on each "dosage

form and strength" of a "covered outpatient drug," purchased by Medicaid during the quarter at

issue and pursuant to the statutory rebate formula.  *Id.* ¶ 11; 42 U.S.C. § 1396r-8(c).

Mallinckrodt further agreed to make timely retroactive rebate payments associated with any

changes in price data "in the same 30-day time frame as the current rebate invoice."  Compl.

¶ 21; Rebate Agreement § II(f), 83 Fed. Reg. at 12785.  Until 2012, Mallinckrodt agreed that the

statutory formula required Acthar's Base Date AMP to be the third quarter of 1990 and the

company paid Acthar rebates on that basis.  Compl. ¶ 47.  Clearly, it knew the rules.

### C.     Mallinckrodt Repeatedly Ignored CMS's Warnings To Correct Acthar's Base Date AMP And To Pay The Proper Rebate Amounts.

The Complaint sufficiently alleges that Mallinckrodt acted with scienter—that

Mallinckrodt knowingly underpaid all Medicaid rebates for Acthar since 2013 by refusing to use

the Base Date AMP that the statute required.  Mallinckrodt's knowing conduct began in 2012,

when it deceptively represented the 2010 approval of the infantile spasms indication to be an

NDA separate from Acthar's 1952 NDA, rather than a mere efficacy supplement that FDA had

labeled an NDA only "for administrative purposes."  Compl. ¶¶ 49-53.  When CMS responded

by letter in August 2012 that that "the recently approved Acthar Gel was approved under a

different [NDA] from the original product," Mallinckrodt 1) knew this was wrong; 2) was on

notice CMS had premised its letter on a mistaken premise (borne of Mallinckrodt's own lack of

24

candor); and 3) started paying lower rebates without any attempt to correct CMS's misunderstanding.  *See supra* at 7-8; *see also Verma*, Att. B at 21 n.10 ("Questcor was on obvious notice" of the situation but did nothing); *Verma*, 2020 WL 1312716, at *19 ("Placed on notice of [CMS's] erroneous assumption . . . [Mallinckrodt] gambled by implementing a new base date AMP for Acthar . . . particularly in light of the statute's clear language[.]").  Moreover, Mallinckrodt also knew that CMS would not permit the *same* product, approved and marketed under the *same* NDA, to simply "reset" its base date AMP.  *See* Compl. Ex. 21 at 1; *see also* Att. B at 4 (stating that "CMS correctly cautioned Mallinckrodt in 2012" of this reality); *Verma*, 2020 WL 1312716, at *22 ("Mallinckrodt had fair notice that if Acthar with the infantile spasm indication was not an entirely new drug product, CMS could not authorize a new base date AMP for it.").

As discussed above, Mallinckrodt also knowingly rebuffed years of agency warnings from 2016 onward.  *See supra* at 9-10.  In April 2016, CMS explained in writing to Mallinckrodt that Acthar "is marketed under NDA 008372 not NDA 022432," and therefore "the baseline data for [the new Acthar NDC] need to follow the baseline data of the original NDC 63004-7731-01, " meaning that Mallinckrodt must report the 1990 Base AMP associated with the original NDC.  Compl. ¶ 57 & Ex. 23.  After Mallinckrodt asked in May 2016 if it was "required to make any changes," CMS replied in June 2016 by again instructing the company to correct its reporting so that it would match the original baseline data associated with NDA 008372.  Compl. ¶¶ 63-64.  As Mallinckrodt's senior manager of government reporting acknowledged, "[m]y view was CMS saw this as the same product, and they . . . were requesting that we change the baseline AMP to the original baseline AMP."  Compl. ¶ 65.  CMS warned Mallinckrodt again in March 2017 and in 2018, but Mallinckrodt still refused to pay the true rebates owed.  *Id.* ¶¶ 73-74, 78.  CMS

issued still further final warnings in early 2019, but Mallinckrodt sought to forestall agency enforcement action even longer by seeking audiences with more senior government officials. *See id.* ¶¶ 81-86. In the end, these attempts and its lawsuit against HHS have simply reinforced what Mallinckrodt knew; what CMS communicated; and what the plaint text of the Rebate Statute made clear all along—the company must pay rebates on Acthar using the 1990 Base Date AMP because FDA approved the drug in 1952 and Mallinckrodt and its predecessors have always produced, distributed, and marketed the drug under the 1952 NDA. *See also Verma,* 2020 WL 1312716, at *21-22.

In particular, the agency's repeated warnings and directives to Mallinckrodt are direct evidence bearing on the company's scienter under the False Claims Act. The agency's warnings "refute[] any colorable argument" that Mallinckrodt "might have in an enforcement action that it was acting without knowledge of CMS's position." *Ipsen*, 943 F.3d at 957. Indeed, correspondence from CMS that instructs a manufacturer to calculate rebate amounts using the correct Base Date AMP "could be potentially dispositive proof in an enforcement action … because 'knowingly' means 'that a person, with respect to an act, has actual knowledge of the act, acts in deliberate ignorance of the act, or acts in reckless disregard of the act, and no proof of specific intent to defraud is required.'" *Id.* at 958. Thus, the CMS correspondence alone is more than sufficient to meet the scienter pleading standard for the reverse false claims and conversion claims at this motion to dismiss stage.

### D.      Mallinckrodt's Internal Actions Also Reflect Scienter.

 Beyond the agency warnings, Mallinckrodt's own internal actions also reflect that it understood and disregarded its obligation to pay additional Medicaid rebates. *See Gen. Hosp. Corp.*, 394 F. Supp. 3d at 190 (finding that complaint alleged "a reaction to internal allegations

of non-compliance that, construed in the light most favorable to [plaintiff], suggests a deliberate indifference and reckless disregard for the truth or falsity of the alleged non-compliance"). After receiving CMS's April 2016 directive, Mallinckrodt calculated that complying with CMS's directive would result in a 223% increase in the rebate the company owed on Acthar for the first quarter of 2016 alone. Compl. ¶ 59. In June 2016, Mallinckrodt calculated that it would owe $258 million in retroactive Medicaid rebates if it followed CMS's direction and reset Acthar's Base Date AMP back to 1990. *Id.* ¶ 68 & Ex. 28. An internal audit committee presentation in 2018 likewise recognized that CMS had "retracted" – past tense – its 2012 letter, and the resulting rebate liability "would be retroactive to 2010 through current, and would be in the hundreds of millions of dollars." Compl. ¶ 77 & Ex. 29.

In addition, Mallinckrodt understood that CMS was correct about what NDA the company needed to use to determine Acthar's Base Date AMP. In an email from Mallinckrodt's senior director in regulatory affairs, Kevin Healy, to the senior manager of its government price reporting department, Healy described NDA 022432 as a "temporary NDA tracking number for the Infantile Spasms approval," and stated that 008372 is the "pertinent" NDA. Compl. ¶ 60 & Ex. 25. Thus, the Mallinckrodt employee with regulatory responsibility for the drug knew and told the company's government pricing team that, contrary to the company's later self-serving and disingenuous assertions, there was only one Acthar and that the applicable NDA was from 1952, not 2010.

Mallinckrodt now argues that the complaint fails to plead knowledge that the payments were "past due" because Mallinckrodt alleges it believed there was "ongoing dialogue" with CMS, *see* Memo at 28, but there was no "ongoing dialogue." Rather, as the complaint alleges, the course of communications reflects ongoing warnings and directives from CMS that

27

Mallinckrodt should comply with its quarterly rebate obligations, and ongoing refusal by Mallinckrodt to do so.  By way of analogy, Mallinckrodt's monthly utility bills do not become any less "past due" if it fails to pay them and writes the utility company in protest.  Likewise here, Mallinckrodt could not suspend its obligations under the Rebate Statute by writing letters and ignoring CMS's instructions to pay the correct rebate amount.  The company's decision to ignore CMS's warnings and its own internal analysis, to feign ignorance in communications with CMS, and then to sue CMS only when CMS threatened enforcement action shows that Mallinckrodt knowingly underpaid Medicaid rebates for Acthar.

## IV.    THE COMPLAINT PROPERLY PLEADS UNJUST ENRICHMENT.

The government has sufficiently pleaded that Mallinckrodt unjustly enriched itself.  To plead an unjust enrichment cause of action, the government must allege:  (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment for its value.  *Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 57 (1st Cir. 2009), *decision clarified on denial of reh'g*, 559 F.3d 1 (1st Cir. 2009).  The government has done so.

As to the first element, the complaint alleges Mallinckrodt received a benefit in the form of rebate funds owed to Medicaid which it withheld.  *See, e.g.*, Compl. ¶¶ 106-07.  As to the second, for the reasons described above with respect to scienter, Mallinckrodt had knowledge of this benefit.  As to the third element, the complaint alleges that Mallinckrodt has retained hundreds of millions of taxpayer dollars to which the company is not legally entitled.  This windfall came at the expense of the Government's insurance program for the poor and disabled, and resulted from exactly the type of meteoric drug price increases that Congress, through the

Rebate Statute, sought to insulate the Medicaid program from paying.  Such conduct by

Mallinckrodt "would seem to fit any notion of 'unjust.'"  *Lass v. Bank of Am., N.A.*, 695 F.3d

129, 141 (1st Cir. 2012) (rejecting argument that alleged insurance scheme by which bank

profited was not inequitable as a matter of law).[11]

Mallinckrodt also incorrectly asserts that CMS may bring an enforcement action under

Sections 1396r-8(c)(4)(A)-(B) to recoup payments it determines Mallinckrodt has underpaid.

*See* Memo at 29.  The "classification" to which the Rebate Statute refers applies to a

manufacturer's classification of a drug as either "single source," "innovator multiple source," or

"noninnovator multiple source."  42 U.S.C. § 1396r-8(k)(7); *see also* 77 Fed Reg. 5318, 5323

(Feb. 2, 2012) ("The drug category represents whether an NDC is *classified* as a brand name

drug (single source drug (S) or innovator multiple source drug (I)) or a generic drug

(noninnovator multiple source drug (N)).") (emphasis added).  Section 1396r-8(c)(4)(A) does not

give CMS a remedy at law for misreporting a drug's Base Date AMP.  Even if that section did

apply to Mallinckrodt's misreporting of Acthar's Base Date AMP, it would not be an adequate

remedy because Mallinckrodt has benefitted unfairly from what amounts to an interest free loan

from CMS and state Medicaid programs.  *See United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d

1 (1st Cir. 2005) (holding that Medicare Act did not preclude the government from bringing an

unjust enrichment claim to recover overpayments).

Finally, Mallinckrodt's Rebate Agreement does not supplant the government's eligibility

for equitable remedies.  *Cf.* Memo at 29.  The Rebate Agreement is merely "the means by which

---

[11] While Mallinckrodt cites to *Genzyme Corp. v. Fed. Ins. Co.*, 622 F.3d 62 (1st Cir. 2010) (*see* Memo at 30), that case addressed an insurance coverage dispute and did not establish a standard for judging the equities of an unjust enrichment claim.  *See id.* at 70.  Even if the language quoted by Mallinckrodt were relevant, the complaint alleges in detail how Mallinckrodt improperly retained rebate funds.

drug manufacturers opt into the statutory scheme." *Astra USA*, 563 U.S. at 118.  Accordingly, "[t]he statutory and contractual obligations, in short, are one and the same." *Id.* (finding no private right of action in 340B program under those manufacturer agreements where none is provided by statute).  CMS has likewise explained, "The [Rebate Agreement] is not a contract.  Rather, it should be viewed as an opt-in agreement that memorializes the statute and regulations."  83 Fed. Reg. at 12771.  Because the Rebate Agreement is an operation of law rather than an arms-length contract, it does not divest the government of its right to equitable remedies.

Moreover, Federal Rule of Civil Procedure 8 permits a party to "state as many separate claims or defenses as it has, regardless of consistency."  Therefore, the government may pursue its unjust enrichment claim at this stage of the litigation regardless of any potential alternate remedies.  As this Court has previously noted, "Courts have been flexible regarding when in the trial they require the plaintiff to choose its avenue of recovery."  *Mass. v. Mylan Labs.*, 357 F. Supp. 2d 314, 324 (D. Mass. 2005) (Saris, J.) (denying motion to dismiss unjust enrichment claim in Medicaid drug rebate case); *see also Lass*, 695 F.3d at 140 (noting "it is accepted practice to pursue both [contract and unjust enrichment] theories at the pleading stage").

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that Mallinckrodt's Motion be denied in its entirety.

Dated:  August 10, 2020    Respectfully submitted,

          ANDREW E. LELLING
          United States Attorney

          /s/ Evan D. Panich
          GREGG SHAPIRO
          EVAN D. PANICH
          Assistant United States Attorneys
          1 Courthouse Way, Suite 9200
          Boston, MA 02210
          (617) 748-3100
          gregg.shapiro@usdoj.gov
          evan.panich@usdoj.gov

          ETHAN DAVIS
          Acting Assistant Attorney General

          ANDY J. MAO
          AUGUSTINE M. RIPA
          MICHAEL A. HOFFMAN
          Attorneys, Civil Division
          United States Department of Justice
          P.O. Box 261, Ben Franklin Station
          Washington, DC 20044
          (202) 305-4033
          augustine.m.ripa@usdoj.gov
          michael.a.hoffman@usdoj.gov